Case No. 17-1098 et al. Allegheny Defense Project et al. Petitioners v. Federal Agencies for Commissioned Dispensing for Petitioners Allegheny Defense Project et al. Ms. Casella, for the respondent. Mr. Sobiette, for the intervener. May it please the Court. Elizabeth Benson on behalf of Allegheny Petitioners. I'd like to take a few minutes, four minutes, to address the issues we raised focusing on the NEPA claim. And then Ms. Cole will take five minutes to address the landowner's claims, including public use and due process. The Atlantic Sunrise Pipeline Project accesses new sources of gas in Pennsylvania. End users will burn it. As a result, every year for the next several decades, this one pipeline could have the same climate impact as eight coal-fired power plants. FERC's cursory treatment of these downstream impacts is a textbook NEPA violation. And I'd like to focus on two problems in particular. First, FERC dismissed this impact as insignificant. That was based only on speculation that some unspecified amount of downstream emissions may be partially offset. Second, FERC ignored the cumulative climate impact of a physically connected pipeline that was before the same agency at the same time, proposed by the same applicant, that had the shared goal of bringing gas from Pennsylvania to Florida. So first, I'd like to briefly address one of the ways that FERC's unanalyzed and conclusory assertion regarding insignificance vaguely undermined its decision making. And this applies equally if you accept FERC's new position that it never discussed significance at all. So in explaining its public interest determination, where FERC weighed the project's benefits against its adverse impacts, FERC repeatedly emphasizes that it ensured the project's impacts would be less than significant. You can see this in FERC's brief at page 20, 22, 27, 45. So the absence of significant impacts was a key factor in FERC's decision to approve this project. But for one of the project's biggest environmental consequences, we have no idea if that's accurate, because FERC hasn't analyzed or discussed it. It's not even clear if FERC gave any consideration to these emissions and its public interest balancing, because even after this court's decision last year in Sierra Club v. FERC, FERC continues to insist these emissions are not an indirect effect. But as that decision made clear, and FERC, therefore, they are indirect effects, and FERC, therefore, has to meaningfully analyze and consider them. FERC can't just stick a few numbers and percentages into an EIS and stop there. NEPA is not a number-crunching exercise. What more should it have done? Well, we wanted them to comply with this court's decision in Sierra Club v. FERC. Yeah, but what? So first of all, to try to figure out the actual net change in emissions. This court said in Sierra Club v. FERC— Net change? They state that NASCAS emissions from the pipeline, right? They have that in tons, in percentage, right? They say that the full burn scenario is 32.9 million metric tons per year. They say that the actual amount, the net increase, or perhaps even reduction, is some lower amount, unspecified, indeterminate, but that they say is insignificant. Although now they're claiming that they never said that. So we don't think that's enough because this court's opinion in Sierra Club v. FERC said specifically that the EIS there failed to fulfill its primary purpose because the decision-maker would not know the net increase or reduction. Where is that? What happened in that case was there was no quantitative estimate at all. That's correct. Well, that's not—so they've made a quantitative estimate here. They've said this is the upper bound. They think it's going to be somewhat lower. They don't know how much lower. And they think that given the upper bound, it's not significant. What more do you want them to say? Well, I think they never said that 32.9 million metric tons is not significant. They said that it would be reduced by some unspecified offset, which would render it insignificant. And moreover, so this court in Sierra Club v. FERC didn't just say you have to quantify. It didn't say once you can put that number in, you're done. It said several other things. First, it said that FERC has to discuss significance and cumulative impact. This one sentence in the EIS does not accomplish that. Where does it say that? In the—it says— In the case? Yeah. I think it's at around 1360—71. But I can give you the exact case citation. Yeah, it says the EIS needed to include a discussion of the significance of this indirect effect. They discussed it, and they said it wouldn't be significant. We don't think that one conclusory, unanalyzed assertion is sufficient— Well, it's a paragraph discussion. I'm not sure in the order issuing the certificate. Well, this court— We didn't say how many paragraphs you have to use. That's true. But this court squarely rejected the idea of just dismissing the impact based on an unspecified offset. And moreover, now they're saying that they didn't make that calculation at all or that assessment at all. They're saying, we never made the significance determination. So it's unclear how they would have balanced the benefits versus the adverse effects if they never made that determination. So you want us to send it back and ask them, is it significant? And if they say it's not significant, that'll be the end of the matter? No, we'd like them to try to calculate the actual net increase. Well, assume that all they can do is 32.9 because the other things are offsets that are uncertain. Assume it's 32.9. And assume they come back and say that's significant. Well, we'd like— Not significant. Then what? We'd like an actual discussion of why that is or is not significant. Well, what do you think the test for significance is? I think that's largely up to the agency, although we would have had ample comment on that if— Well, you could have commented on that. You could have commented on this question. Well, we commented on FERC's conclusory assertion. I don't understand what— Look, we asked them to quantify. We conclude that the EIS should have either given a quantitative estimate of the downstream greenhouse emissions that will result or explain more specifically it gave a quantified estimate and it said it doesn't know exactly how much lower because there are a lot of different things that can happen, substitution, et cetera. In fact, we wouldn't believe them if they gave a specific net reduction because no one knows how energy users are going to react to this. Well, first of all, they did have information that they could have used to try to make a better prediction. At JA338, they talked about some of the shippers' end uses, but the shippers volunteered apparently, which they did not use and did not try to get similar information from other shippers. But I think more to the point is what they do with that information once they have it. Here they did nothing with the information. They just made a conclusory assertion that's insignificant and apparently did not weigh it in their public interest determination. The Sierra Club v. FERC court also said that FERC has the legal authority to mitigate these downstream effects and that in the alternatives analysis, one of the reasons that quantifying is important is when you look at alternatives, and that's the heart of the EIS, you can compare the quantification from the project to other alternatives. What is the alternative that would be less greenhouse gases? Well, presumably the no-action alternative, but they didn't analyze it. Well, they said there was a public need for the gas, so a no-action alternative doesn't meet the purpose of the agency. Well, FERC also said in the rehearing order that there actually would have been enough renewable energy and energy conservation to provide all the energy that this pipeline is providing, but that wouldn't involve transporting gas, which is the purpose of the project. So I think the no-action alternative wouldn't. Wait, say that again? FERC said in the rehearing order, and I can try to find the site. Why don't you find it? Okay. So this is at JA Joint Appendix 840 to 841. Although the EIS noted that renewable energy and energy conservation could potentially provide equivalent amounts of energy, neither were transportation alternatives and thus would not meet the project's objectives. Could you say again what paragraph it is? It's at Joint Appendix 840 to 841. I'm sorry, I don't have the paragraph number. That's okay. I have 50. So FERC never used its quantified upper bound number to attempt to compare the preferred. Then it goes on in the next sentence. Moreover, renewable energy and energy conservation measures would not provide additional natural gas supplies for residential and commercial uses, including heating and cooking, without extensive conversion of existing systems to electric-based systems. Well, without delving too deeply into the details, because I'm running out of time, or I might have already run out of time, the point is that the alternatives analysis is the heart of the EIS. One of the reasons Sierra Club v. FERC said you have to do this quantification is to look at mitigation and look at alternatives. And for the alternatives, you compare the quantified number for the proposed project to that of alternatives, which for pipelines like this is primarily the no-action alternative. Did you say that in your briefs, that the no-action alternative is really the better alternative here? I don't remember that. I don't think we're saying that. That's the only one, though. That's the only one you have, right? I asked you, and you said the only one is no-action. The only one that has lower greenhouse gases, that's what I'm asking. I believe out of all of their alternatives, they would all be the same size pipeline, transporting the same amount of gas, so that wouldn't change. There would be other alternatives, such as a smaller pipeline, something of that sort, that would change the downstream effect. But what FERC said here, instead of trying to compare the amount that would be emitted under the project to the no-action alternative, it said the end use is going to occur with or without this project. I believe that's at Joint Appendix 381. That is basically saying that building this huge pipeline that's going to emit hundreds of millions of carbon dioxide into the air for the next 30 or so years is the same as not building that pipeline. Can you state where that was? Joint Appendix 381, I believe. You're very good with numbers. I appreciate it. You're going to have to help me there. I'm not seeing where on that page. Again, I don't have the paragraph number, but I think it's kind of in the middle of the long paragraph, if I recall, on J381, that the end use would occur with or without the project, and they're saying there that there's no causal connection between the pipeline and the downstream emissions, which this court squarely rejected in Sierra Club v. FERC, and it's a little unclear. Was the idea that the end use would – 138 is the paragraph. I'm sorry? 138. Yeah, but would that not substitute then coal production? That's what I was thinking. I thought that, yes, there would be the same amount, but it would be coal instead of natural gas that was burning. I believe they're saying there that the gas use would occur either way because the gas would just come from some other source, which makes no sense when you're talking about going into a new area and flooding the market with all this new gas. That's the kind of analysis that the Tenth Circuit found completely inadequate in Wild Earth Guardians. Okay, I'll have to look at it more closely. Maybe when you're sitting down, you can find me. Okay. Are there further questions on the page? No. Thank you. Good morning. I'm Siobhan Cole for the landowner plaintiffs. I'm sorry, not plaintiffs, petitioners. At the heart of all of my clients' arguments is their desire and their right to know that this taking of their private property is truly for a public use. as required by the Fifth Amendment. They've raised those concerns both at FERC and in the Eastern District of Pennsylvania, and now here, since they were told that their property would be taken for this pipeline. And in response, they've consistently been told two things, that the transportation and sale of natural gas in interstate commerce for ultimate distribution to the public is in the public interest, that Congress declared that in the Natural Gas Act, which is obviously correct. But what FERC says to my clients is that because of that declaration by Congress, all that FERC is required to do in order to satisfy the public use element of the Fifth Amendment is to review the precedent agreements that the pipeline proponent has executed with shippers. And what my clients have said in response is that that is not enough, and that FERC should be required to look further. FERC has responded that they do not need to look further, and that there is precedent in this court and elsewhere that allows them to stop solely at the precedent agreements. They had more than precedent agreements here, did they not? A few things more. They had some comments, but from shippers, which we would submit to the court are self-serving statements from… There was a study. And a study from the Clean Air Council, and also one other statement from Washington Gas. So this case doesn't really implicate the question of whether reliance just on precedent contracts would… We would submit to the court that it's a distinction really without a difference because those comments aren't addressing precisely where this… who this gas is being… who these shippers are and where they intend to send the gas that will be transported through this pipeline. And what we submit to the court is that there is a reason to reject the idea that looking at the precedent agreements or comments like these alone is enough. That's because there are several reasons. 2017 marked the first time since 1957 that the United States became a net… a net natural gas exporter. In 2017, the United States exported 0.34 billion cubic feet per day of natural gas. And in the first six months of 2018, net natural gas exports from the United States averaged 0.87 billion cubic feet per day. Now, if we put that against the fact that the Atlantic Sunrise Pipeline is a 1.7 billion cubic feet per day pipeline, you could begin to understand my client's question as to whether this pipeline is really necessary or whether all of the gas that will be transported through this pipeline either will be exported or could be replaced by some of the natural gas that is already exported. On the alternative, like the Conestoga alternative, would that have gone through, I think, not their property, but someone else's property? It would, yes, have gone through other landowners' properties. Can you tell me when the construction on your client's property actually started? I can't tell you as I stand here the precise date, but I can tell you that it began… that my clients have yet to have a hearing on the just compensation of their… of the taking of their property. And so the second element of our argument is that if FERC is not going to consider more than precedent agreements and look further than whether the full capacity for the pipeline has been contracted for, shouldn't the landowners have some ability to challenge that in some form other than simply the pre-certification process before FERC? And taken to their logical conclusion, the arguments set forth by Transco and the Commission are that people like my clients are only entitled… all the process they are due is satisfied by their ability to comment in the pre-certification process. Because once that process is done and a certificate order issues, district courts claim that they are powerless to consider whether the order is appropriate in any way, and they consider it a collateral attack. My clients were told that in the eminent domain proceeding in the Eastern District of Pennsylvania, they cannot mount a collateral attack on the FERC order itself. Yet here, and in our appeals here, and to the Commission itself, the Commission has said that what we are raising is constitutional arguments, and that the Commission, and by extension this court on our petition for review of their decision, is powerless to hear constitutional claims. So my clients are effectively without a forum to ever question whether this taking is truly for the public use, especially since it is happening before they are ever afforded their full deprivation hearing, and the right, for example, to put on evidence as to what the just compensation of their… should be for their property. Can you tell me whether the construction started before the Commission issued its actual rehearing decision on the certificate order? It did. Perfect question. Good morning, Your Honors. Beth Pasella for FERC. I think I'm going to start off with the landowner's due process argument. And I know that the Court didn't address whether there was jurisdiction before it. We made that argument in our brief at the beginning. I would be happy to talk about it, or I'll just get right to the merits on that issue. Why don't you say something about jurisdiction first? Sure. The due process claim by the landowners is that they were denied due process because the right to be heard on whether transgress taking of their property actually satisfies the use requirement of the Fifth Amendment before the property was taken. And that's a clear challenge to the tolling order here, and they didn't seek rehearing of the tolling order. I'm sorry, that's their procedural due process argument, but the substantive due process argument that this wasn't for a public use, that's a challenge to the whole thing. That's not just about the tolling order. Did they raise a petition for rehearing this issue after the tolling order? Their argument is that they – the argument is based on the fact that they were denied due process because eminent domain occurred before commission rehearing and judicial review. And the reason that eminent domain occurred before commission rehearing and judicial review is because of the tolling order and the way that the statute works. So Congress designed the Natural Gas Act to reduce that default outcome. There's no jurisdiction because they didn't challenge the tolling order that caused this delay that they claim. The argument that she just made, which is that this is really not a public use, you could make that after eminent domain occurs. Sure. That could always be unwound if that were the case. So did she make – I don't mean she, I mean her clients. Did they make the argument in a petition for rehearing that this is not a public use because it's for export? They're arguing to this court that it's a due process argument. That's the way that they're making that argument. The commission did address the argument, and I'm happy to talk about what the commission said there. Wait, wait. Hold on. Let's make sure I understand your interpretation. You're saying they didn't make a Fifth Amendment argument, is that what you're saying? They did. Did they or didn't they? They argued – they made that argument. They argued to the commission that the public convenience and necessity finding is not sufficient for a public use finding. That's correct, and the commission did answer that question. That's not a due process argument. That's a Fifth Amendment taking. Right. Taking for without just conversation. Right. For public use. Right. But their argument to the court is – But there's no jurisdictional bar to us hearing that, right? Well, there is only, Your Honor, because the way they've argued it to the court is that it's a due – they were denied due process because of that. Well, that's what I was asking you. Right. Is your due process argument – does your due process argument go beyond the effect of the tolling order? That's right, Your Honor. It does? Yes, it does. So then – Because their claim is – because the reason that they were denied the right to be heard – they weren't, first of all, denied the right to be heard, but their claim is that they were denied the right to be heard because the commission told the order – they told re-hearing and gave the commission legitimately more time to address all of the matters raised on the merits on re-hearing. Did they challenge that after – in their petition for re-hearing? Not of the tolling order, but did they make this argument in the petition for re-hearing? They did make the public use argument. So I guess I'm a little unclear on your view of procedure. The tolling order, you think, is an interlocutory, non-final decision, right? That's right, Your Honor. In all courts and all other agencies, all interlocutory decisions roll up into the final decision. So as long as they put it in their petition for re-hearing, I don't see why they have to put it in a petition for re-hearing of a tolling order. Because Section 19A of the Natural Gas Act provides that re-hearing on a judicial review of any order of the commission has to have the person sought re-hearing. They're challenging the entire procedure by which the certificate was issued, one small part of which is that. Do you have any case that says you have to file a petition for a re-hearing for a stay or for a tolling order, as long as you file one at the end? Yes. I mean, yes. Again, it's Section 19A, but... That's not a case. That's your interpretation of the statute. All right. Yes, I do. That is. Moreau is an example of a case, and I'm sure we cited it in our brief, 982F. What was the order? Excuse me? What was the order? What kind of order was it? It was a tolling order. This court dismissed an appeal of pipeline construction orders as premature. Oh, I'm sorry. It was a construction order. It wasn't a tolling order. No, no. They dismissed an appeal of a pipeline construction order as premature because the commission had issued a tolling order. Yes. That upheld the value of the tolling order. But did they say because you didn't seek a re-hearing petition of the tolling order in that case? The – I don't have – I guess that Moreau was the closest case that I had, and that involves the construction order. Yeah. But my point is that Section 19A does – in my view, and certainly here, they are challenging the commission's use of tolling orders, and they can't do that because they didn't challenge on re-hearing to the commission the tolling order. Okay. They challenged the construction order. They challenged the construction – the environmental petitioners did challenge the construction order re-hearing but did not wait for the commission to issue the re-hearing order, so that's incurably premature. That's the environmental petitioners' due process claim, which they're not arguing about today. No, but the Hilltop petitioners. Did they challenge the construction – sorry, I think I'm having trouble seeing all this straight. The environmental petitioners on their due process claim. The Hilltop – I'm not sure who you're calling the environmental petitioners. The Hilltop petitioners on whose land construction was deferred. Yeah, that's not the land. The landowners have not challenged the construction order as far as I – I might be wrong about that. I'm going to look at my – I'll sort it out later. I don't want to waste your time on that. Oh, I'm sorry. Okay. They both have challenged the construction order. No one waited for re-hearing of that order, so it's incurably premature. The construction re-hearing order is post-record in this case because it wasn't issued until after all the petitions were filed. But I'm happy to talk about the merits of the public use claim. Can you explain why they got their process anyway? Of course. The commission, first of all, carefully considered and addressed the public use claim, so they got all the due process that was due. There are a number of things which I set out in my brief about that, and the final one is that the commission determined, consistent with this court's precedent, that its public convenience and necessity finding meets the taking clause's public purpose showing, and that's in Midcoast. And we cited that in our brief, and petitioners did not even mention Midcoast. So they're not challenging the fact that this court has already determined that the public convenience and necessity finding satisfies the Fifth Amendment taking's public use finding. So I think that it's a – Well, it can if it's a proper public convenience and necessity determination. Of course. So that just begs the question of – but they couldn't challenge that. They couldn't raise that challenge before their property was demolished because of the tolling order. I mean, it seems to me just to stand back for a second and just take a look at what happens in these cases. Sure, Your Honor. Is some homeowner has some property, some pipeline company would like to mow it down and put a pipe there, and FERC says public convenience and necessity, and let's assume for my hypothetical, not saying it's this case, that they do a flawed public convenience and necessity. It's flawed. It's wrong from top to bottom. But they say public convenience and necessity, issue the certificate. All right? Right. They file a petition for rehearing because they would like to challenge that very flawed FERC decision but can't until the reconsideration decision is over. Right. And FERC says we're going to toll this. We haven't had time to sort it out. But what we have had time to sort out is that we should authorize this construction to go forward and demolish the house before there's been a final determination, even by the commission, let alone judicial review, of whether there is, in fact, a constitutionally sufficient public use determination. And the answer is nothing anybody can do about it. We demolish the house. That's not true, Your Honor. There's nothing anyone can do about that. The All Writs Act provides. Okay. But is mandamus really the answer under the Fifth Amendment? Well. That's an extraordinarily high standard. It is an extraordinarily high standard, Your Honor. But as this court said in Sierra Club, that's exactly what the answer is. I'm sorry. We held in Delaware River Keeper. Delaware River Keeper. That is constitutionally sufficient. The eminent domain, the statutory constitutional eminent domain issue was raised. That was the basis of that case. And the court held there that any claim of unreasonable or unconstitutional delay or any other claim designed to preserve the integrity of future judicial review and individual certificate proceedings would lie in a mandamus action filed directly with this court. That's at page 113 of Delaware River Keeper. So, yes, that I think also has already been resolved by this court. Did that case involve people's homes being destroyed? That case was all about the fact that the commission improperly issues. I know, but I'm asking what the injury to property owners was in that case. I don't know, but I wish I did. But let me say this. I'm sorry. But as a matter of good government, does that make sense? Well. That seems really, really harsh to people in the outside world. And this is a very unfair result. When we use these tolling orders, you've got time to do the construction order, but you don't have time to act on their re-hearing decision, and they can't go anywhere. It's got to feel incredibly unfair to people. I don't know why FERC can't do better. Let me say this. That is how the Natural Gas Act is designed. So it's a complaint for Congress if it's a complaint at all. The Natural Gas Act is not designed. You don't have to do it that way at all in these types of cases. You choose to do it. You don't mandate it. Well, the commission has to toll orders, particularly in circumstances like here, because there are just so many re-hearing requests. Maybe there are, but then maybe the commission's position would be, but we're not going to allow irreversibly damaging construction to happen. I mean, that is the double whammy, that we're not acting on this. We're not even making a final decision yet on public interest or public use and necessity. We've got no final decision, but the House goes down. They don't have to do that. In this circumstance, before the eminent domain proceedings began, the claim here, this due process claim, this public use claim, had already been answered by this Court's precedent in Midcoast and had been answered by the certificate order. So before construction began, before the construction order issued and before the construction tolling order issued, the commission also had determined that a stay of construction pending commission re-hearing of the certificate order was not warranted. I don't know how that answers my concerns. The concern is that the commission had already determined that there was not irreparable harm, that there wasn't irreparable harm, and that the normal procedure under the Natural Gas Act, which is that there's no stay of the orders. There's not irreparable harm because they can get money afterwards. Right. Is that the theory? But if it's someone's home that's getting demolished, I understand that, Your Honor, but Congress enacted the Natural Gas Act with no automatic stay, explicitly saying there's no automatic stay for a re-hearing request, there's no automatic stay for judicial review. FERC has to do it this way? Is that what you're telling me the statute says FERC has to do it this way or it chooses to do it this way? I think that FERC has to, in a circumstance like this, has to issue a tolling order because it cannot resolve reasonably the re-hearing request on the merits. Does it have to issue construction orders before it resolves the re-hearing decision? No, of course it doesn't have to do that. But in a specific factual circumstance, like here, the commission would have found it would have had to do here if that question were raised to it because there was public need for this capacity. But that all dances around my hypothetical, at least, where you have a flawed FERC decision. And so FERC is sort of blockading through its practices here, blockading the ability to have that tested before the house gets demolished. But it was tested before FERC, Your Honor, and again, the All Writs Act exists. And the petitioners here sought a stay from this court twice, which was denied. So this court itself found that there was not irreparable harm in this case. Or maybe not a likely success on the merits. That's right, Your Honor. Good point. That's right. There are four factors. I mean, it's hard to say there isn't irreparable harm. I understand, Your Honor. I thought FERC relied just on irreparable harm. It did not say. Am I wrong about that? FERC does not have a likelihood of success on the merits factor. It uses the other factors. And in the stay. I was talking about here. Yeah. No, of course. If there's nothing else on that issue, if you want me to talk about greenhouse gas, I can. Otherwise, I'm surely over my time. Could you just explain to me how just dropping a number lets me know whether or not it's significant or not? I think the commission explained why it can't. In a later proceeding, it's explained why it can't make a specific significance finding. Although the commission did here. Did it make a significance finding or didn't it? The commission didn't make a significance finding. It did not? It did not. Doesn't regulation require it to make it? It requires a discussion of significance. So significance was addressed here. Exactly. So. Explain that. Commission regulation requires, requires that the EIS discuss indirect effects and their significance. That's right. That's not making a significance finding, per se. They just have to discuss their significance, not make a finding. Well, the significance finding is part of the decision to not do an EIS. That's absolutely right. Once you've decided to do an EIS, that means you already say there's a significance. That's right, Your Honor. So, yes. So. Well, yes, what? So the commission has explained why it doesn't make a specific significance finding, which also isn't actually required in this circumstance. But it does discuss the significance. What the commission did here, completely consistent with the Sierra Club remand opinion, is it not only did it quantify the 32.9 million metric tons per year of carbon dioxide equivalent, which it had done even before Sierra Club came out, but post-Sierra Club it further quantified the maximum downstream emissions that could occur here. It compared it to the most recent, which was 2015, total gas GHG fossil fuel combustion inventory for the 16 states to which the gas could possibly go, and to the same national. And it came up with numbers that are 1.4 percent for the states. The problem is it dropped numbers and didn't do anything. I mean, how do we know 1.6 percent isn't significant? What if you had all these states were sort of had been non-attainment or borderline attainment areas, and suddenly this increase is happening? And why can't FERC figure that out? The commission explained why. Well, first of all, and I think what you're talking about is something like the social cost of carbon, which the petitioners did not raise. I'm not talking about that. I'm just saying. Just based on that? Say half the states that this large number is going into are non-attainment states who are working really hard to clean up the clean house gases. I get that's an EPA program, but marginal differences can make an enormous impact on air quality and compliance with other legal obligations. So it would be a little hard to just say that's not significant just because it sounds like a small number. I think the commission's point is that it can't, that that's as far as it needed to go to provide enough information to determine that this project, that the greenhouse gases here, as part of the environmental analysis, that it was environmentally acceptable, which is what the commission's determination was, that the environmental impacts were environmentally, were acceptable here. If I could just say one more thing. I mean, this is exactly the analysis that was done in Sierra Club remand, and no one has challenged that on appeal. The time for appeal has gone by, and so it seems that the parties understand as well that this is consistent with what the court required in the Sierra Club opinion. Thank you. Good afternoon. It's Con Stobiak for the intervener of Transco. Just two quick points. One, the project is in service. It's been in service since October 6th, 2018. It's 100% subscribed and is moving approximately 2 billion cubic feet of gas per day, and it's going to various places in the southeast as well as in the mid-Atlantic states. Secondly, on the due process questions, this was touched on, but I just want to emphasize, the landowner petitioners commented to FERC. Hilltop Hollow had seven comment letters. Hoffman had two comment letters to FERC. They moved for a stay before FERC, which was denied. They then moved for a stay in this court, which was denied twice, and they have the All Writs Act there. And the last point I'd make is I understand, Judge Mollett, your scenario that you lose your house. What's the scenario as I understand it? The scenario is the protectable interest here under the Fifth Amendment is you're entitled to just compensation if there is a public need. If there's a public need. That's right. And if, in fact, you think you are going to lose your house and there is no public need, you can raise that in your emergency stage, you can raise that in your comments, and you can raise that in the All Writs Act, which allows not just mandamus but injunctions. So they've had plenty of opportunity to raise that issue. It's been denied. And those very, very high standards that have to be met for that are sufficient even when there is not yet a final decision on public need. Where is that? What case is that? Well, those are high standards, but there's been – There is not yet a final decision on public need. That is correct, but that's what Congress said you should do once you have the – and that was their determination in the Natural Gas Act. Once you have the certificate order, you should proceed. Further questions from the bench? Thank you. Ms. Brewer. I'm sorry. Ms. Benson, sorry. Wrong case. First of all, with your question about the sentence on JA381, I'm not sure if I completely understand. No, it's my – I figured it out. My confusion – you're right. That is about gas. My confusion comes from the final environmental impact statement, which says that the advantage of the gas is downstream end use would result – natural gas is a lower CO2-emitting fuel when compared to other fuel sources, fuel oil or coal, and because fuel oil and coal have been and remain widely used as an alternative in the region, increased production and distribution of natural gas would likely displace some higher carbon-emitting fuels. Right, and that's – And likewise, if there's less, there's more likely that coal and oil will be used. Well, that's exactly the conclusive statement in the Sable Trail Fair Club deferred decision that this court rejected. And, of course, there was no downstream – It is, but in that one, there was no estimation at all of how much greenhouse gases – Right, but what this court said was that the EIS failed to fulfill its primary purpose because the reader would have no idea of the degree of reduction or increase on net. Yeah. So that's the same thing here. We don't know on net because FERC's just made this conclusory statement that it thinks it would be reduced. I mean, it also said it would access new gas supplies for increased gas demand. It's unclear where that gas demand is coming from. Because FERC has not investigated it – And like I said, they have a few downstream shippers and one downstream user who have given some indication at JA338 and in FERC's brief of what they plan to do with the gas. But FERC made no attempt to try to get more information to figure out, is it displacing coal? Is it displacing renewables? They don't do any work to try to find out, and NEPA requires that they use best efforts to do that. So I don't know if there are any more questions. What would be the consequences if there were a determination, the same if hypothetically, that they had not properly analyzed greenhouse gas emissions in this case? What happens then? We would ask that this court vacate the certificate order. What happens to this existing pipeline operation then? We think at a minimum the new Greenfield pipeline in Pennsylvania should halt operation during that time. The project also involves – Why that one? What's that? Why that one? Well, the project also involves making the entire main line, or at least from Pennsylvania to Station 85 in Alabama, bidirectional. And we think it's likely that shutting that down would not be feasible, at least according to what interveners have told us so far. Whereas the new pipeline in Pennsylvania was just put into service a month or two ago, so we think it would be a more feasible remedy to shut that down during remand than to try to vacate the entire thing. But we'd be happy to submit additional briefing on a more tailored remedy if the court would like. May I ask, opposing counsel mentioned the remand in the original Sierra clip. It's not the original, obviously, but earlier. Do you want to talk about that? Yeah, I was going to say that the lack of challenge to that remand order does not reflect agreement with that remand order. I guess my question would be what – this time instead of a discussion they give about 10 pages of explanation for why they can't do any better than they're doing. Do you have a challenge to that? How do they actually explain why they can't do more? How they explain it in the Sable remand order? My first response is that they can't rely on something in another place. I got it, I got it, I got it. My question is, were we to remand, and they said, okay, here's our reason, and they just say, we've already said our long reason. I'd like to know what you would say in response. Well, we would probably take a long time to formulate comments on that when they did their draft supplemental statement. And we did have comments on the Sable remand order when it was still a draft supplemental EIS. I can't remember all the specifics of those right now. Maybe it's an unfair question. I would say that two of the commissioners, Commissioner LaFleur and Commissioner Glick, have said that that is incorrect, that they can come up with a significance determination. Fair enough, but FERC commissioners have a different standard of deciding what FERC should do than we have on review, right? We have a deferential standard. They have a de novo decision about what, if they were in the majority, they would do. Isn't that right? The fact that they think they could do more is not the question. The question is whether what they've said here is enough from an arbitrary and capricious point of view. Right. I think the question here is whether this one paragraph in the EIS, that includes no data or analysis, is sufficient, or alternatively if their new statement in the briefing, which we think is unsupported, but regardless supports our argument that they didn't do an adequate job here, that they can't do a significance finding, that either way the court should vacate and remand. And just to take a moment to say why this matters, because what FERC is doing now is sticking a full-blown number in each EIS, environmental impact statement, although now they've backed off on that too, asserting with no support or analysis that it will be offset to insignificance or that they can't determine the insignificance. Then they approve the project saying that all impacts have been reduced to insignificance and that it's an environmentally acceptable action based on that totally cursory analysis. So then we have one agency in a pretty short period of time approving all these pipelines. We list some of them in our opening brief, page 29, footnote 17. And they're saying, well, this one's .6 percent of the nation's emissions. This one's 1 percent. This one's .5 percent. So all of a sudden you have this one agency approving pipelines that account for 4 or 5, 6 percent or more of the nation's greenhouse gases, and they've never taken a hard look at the impact. So we request that the court vacate, and if there's no further questions. And are there? No. There aren't. Thank you. All right. We'll take the matter under submission today. Has everybody talked? We're supposed to talk. Yeah. Did she want to talk? Yeah. I knew I left them out. Sorry. Just a few brief points. First, my client's petition is not based on the tolling order itself. It's based, our due process challenge is based on the entirety of the procedure that they have been put through here and what has been available to them. On that point, I would point out that the United States Supreme Court said in notice and an opportunity to be heard before a final taking. And although the judicial model of an evidentiary hearing may not be warranted in every case, the right to be heard nevertheless requires that the available procedures be tailored to the capacities and circumstances of those who are to be heard. I would submit to you that the All Writs Act is not a procedure tailored to the capacity of the United States Supreme Court. All the procedures that I'm talking about are an anomaly among many people affected by these, by pipelines and this procedure because my client's actually had the means to fight these fights, to hire a lawyer. On that note, the eminent domain proceedings are not something that's available to everyone and accessible to everyone. It ignores the fact that my clients were sued in the Eastern District of Pennsylvania for the taking of their property and they had to hire a lawyer to defend them. They were able to do that. Many people are not. They were able to hire an attorney to file a request for rehearing and see it through and file a second request for rehearing after the final decision and after the tolling order was lifted and to file a petition for review in this case and to seek review of the denial of their rights in the Eastern District of Pennsylvania in the Third Circuit. Many, many people cannot do that. And just as Your Honor pointed out, they are left without anywhere to go in response to this. I would also point out that the Natural Gas Act does not require FERC to follow the procedure, that it is followed here and that it consistently follows. In fact... Do you have a sense of how often FERC issues construction orders along with or after issuing a tolling order, before a rehearing is decided? I can't say how often the construction order issues, but I can say that tolling orders are the norm, that FERC almost always issues a tolling order in response to a request for rehearing without a concomitant stay of construction or moving forward, because there is pre-construction activity that goes on as well. There's clearing, there are environmental surveys, things of that nature. Because the procedure does not require the eminent domain proceeding to wait while the tolling order is sitting, and that is precisely what happened to my property, happened before the construction order and before the petition for rehearing was decided. It was entered by the District Court. And what I would say is that what's missing here is also that in enacting the Natural Gas Act, Congress did not say that this is the default outcome that should happen. What Congress said is that landowners like my clients need to petition for FERC, and if FERC does not act on that within 30 days... Right, so the problem here may be that we were wrong before in saying that act includes just issuing another tolling order. That, in fact, the Natural Gas Act points in your direction, that they need to act in 30 days and then give you a chance to go to the Court of Appeals. That would be one permissible option. The problem for us, of course, is we have a number of cases on this subject, but personally I'm mystified by how filing a tolling order is the kind of act that Congress actually meant. I would agree with you, Your Honor, but I also accept the argument that in certain circumstances FERC may need more than 30 days to adequately address a request for rehearing, or perhaps many, and it makes sense that perhaps they should not be denied the time that they need to adequately deal with that. But the simple response to that is that if FERC needs more time, then FERC should also enter a stay of construction or a stay of the certificate orders. Or FERC should go back to Congress and ask them to extend the 30-day. Congress obviously put in 30 days for a reason. They wanted the chance for people to appeal, and this is maybe a statutory problem or from FERC's point of view, and it may be a legal problem from our point of view. Are there further questions, Your Honor? Thank you. I think now we'll take the matter under suspension. Thank you. Stand, please.
judges: Garland, Tatel, Millett